FILED
2013 Apr-11  PM 02:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **GREGORY LEWIS MOORE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:12-CV-00755-RDP** |
| | } | |
| **MICHAEL J ASTRUE,** | } | |
| **Commissioner of Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Gregory Lewis Moore ("Plaintiff") brings this action pursuant to Section 205(g) and Section 1613(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner or Social Security[1] ("Commissioner) denying his applications for a period of disability and disability income benefits ("DIB") under Title II, and supplemental security income benefits ("SSI") under Title XVI. *See* 42 U.S.C. §§ 405(g), 1383(c).  For the reasons outline below, the court finds that the decision of the Commissioner is due to be affirmed.

## I.      Proceedings Below

On December 31, 2009, Plaintiff filed an application for DIB under Title II of the Act and for SSI under Title XVI of the Act.  [R. 112-118; 119-122].  Plaintiff alleged a disability onset date of March 4, 2009. [R. 112, 119].  Plaintiff's applications were denied on February 26, 2010. [R. 13, 91-95].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 27, 2011. [R. 48-78; 98-100].  In his August 12, 2011 decision, the ALJ denied disability benefits concluding that Plaintiff was not disabled under Section 216(i), Section 223(d),

---

[1]On February 14, 2013, Carolyn Colvin became the Acting Commissioner of Social Security.

or Section 1614(a)(3)(A) of the Act. [R. 24]. After the Appeals Council denied Plaintiff's request for review of the ALJ's decision, that decision became the final decision of the Commissioner, and therefore a proper subject of this court's review. [R. 1]. *See* 42 U.S.C. § 405(g).

At the time of the hearing, Plaintiff was 52 years old and had received a GED. [R. 52]. Plaintiff was currently living with his cousin, his daughter, and his grandson. [R. 53]. Plaintiff had previously worked as a safety guard and in a machine shop. [R. 53]. Plaintiff testified that he stopped working in 2009 because he could not handle the physical demands of the job. [R. 57]. Plaintiff claimed that he would "get tired too easily" and would "have to rest." [R. 57]. When he stopped working in 2009, Plaintiff applied for unemployment benefits, which he received for a period of time. [R. 54]. Plaintiff testified that those benefits terminated two weeks prior to his hearing. [R. 54]. When asked by the ALJ if Plaintiff told the State of Alabama that he was capable of working in order to obtain unemployment benefits, Plaintiff replied that he "needed the money." [R. 54]. Plaintiff stated that he indicated to the State of Alabama that he was capable of working but that he did not look for work while collecting unemployment benefits. [R. 55].

In response to questioning from his attorney, Plaintiff stated that he had been diagnosed with congestive heart failure and high blood pressure. [R. 55]. Plaintiff alleged that he suffers from chest pain about once or twice a week. [R. 58]. According to Plaintiff, these episodes last about five minutes. [R. 58]. Plaintiff also stated that he sometimes has trouble breathing. [R. 58]. According to Plaintiff, his difficulty breathing is worse when he tries to sleep at night and he stated that he must nap during the day to make up for his loss of sleep at night. [R. 59].

Plaintiff testified that his blood pressure is "not really" under control. [R. 60]. Plaintiff claimed that he gets dizzy, nauseous, and shakes when his blood pressure spikes. [R. 60]. Plaintiff

claimed that he was taking Coumadin regularly along with a list of medications submitted by his attorney prior to the hearing including Core, Enalapril, Lasix, Potassium, and Norvasc. [R. 57, 212]. Plaintiff testified that these medications cause dizziness and drowsiness. [R. 58].

Plaintiff claimed that his symptoms make it difficult for him to stand for a prolonged period of time. [R. 61]. Plaintiff testified that he "cannot stand that long" and must sit down or lie down "after a while." [R. 61]. Plaintiff also stated that he cannot sit for a long period of time in a chair and must lie down on the couch. [R. 62]. Plaintiff stated that he spends eight hours a day reclining at home. [R. 62]. Plaintiff claimed that he can walk about one block before he gets tired. [R. 62]. Plaintiff testified that he could comfortably lift about seventy (70) pounds but not for long. [R. 62].

Plaintiff does some laundry and light cooking. [R. 63]. He can get in and out of the shower without trouble but stated that he does get tired when he bathes himself. [R. 63]. Plaintiff does take the trash out occasionally. [R. 69]. Plaintiff avoids grocery shopping because he "get[s] tired of walking through the store trying to find what [he wants]." [R. 64]. Plaintiff does not have a driver's license and does not drive. [R. 70].

In response to further questioning from the ALJ, Plaintiff stated that he has not stopped drinking alcohol even though his doctor has told him to do so. [R. 67]. Plaintiff testified that he had a beer the day before the hearing. [R. 68]. Plaintiff smokes three to four cigarettes a day even though his doctor has advised him to stop. [R. 68].

The earliest relevant medical records provided by Plaintiff in support of his claim are from a February 2007 hospitalization. [R. 540-549]. Plaintiff was admitted to Huntsville Hospital on February 9, 2007 with alcoholic cardiomyopathy and new onset of congestive heart failure. [R. 541]. Plaintiff was discharged on February 21, 2007, and treatment notes reflect the following discharge

diagnoses: peripheral edema with new onset of congestive heart failure; alcohol abuse with mildly elevated liver function test; history of hypertension; ejection fraction ten (10) percent with a positive apical thrombus; and normal coronary arteries. [R. 541]. The discharge summary also indicates that Plaintiff was scheduled to follow up with the Congestive Heart Failure Clinic and instructed to discontinue his alcohol intake. [R. 541]. Plaintiff was also instructed to follow up with Dr. Henry Chen in six weeks. [R. 541].

Plaintiff was seen at the Congestive Heart Failure Clinic on a weekly basis from March 7, 2007 through April 9, 2007. [R. 338-347]. From May 2007 through August 2007, Plaintiff returned monthly to the Congestive Heart Failure Clinic. [R. 328-337]. These monthly visits commenced again in November 2007 and continued through October 2008. [R. 305-326]. Plaintiff continued visits to the clinic about every two months throughout 2009. [257-262]. Treatment notes from these visits indicate that Plaintiff's heart condition was classified as Class II under the New York Heart Association symptomatology scale.[2]

During his March 7, 2007 visit, Plaintiff filled out a questionnaire about living with heart failure. [R. 249]. The questions concerned how Plaintiff's heart condition had prevented him from living as he wanted during the previous month. [R. 249]. The questionnaire used a five point scale with zero being "no" and five being "very often." [R. 249]. Of the twenty-three questions, Plaintiff circled the number five only twice, regarding questions about hospital stays and costing him money for medical care. [R. 249]. Plaintiff circled the number three only four times. [R. 249]. With respect

---

[2]The New York Heart Association Functional Classification is a commonly used classification system that places patients in one of four categories based on how limited they are during physical activity. Class II patients has cardiac disease that results in slight limitation of physical activity. *See* American Heart Association, Classes of Heart Failure, http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306 328_Article.jsp.

to the remainder of the daily activities, Plaintiff was either not affected or there was very little impact.[3] [R. 249].

As instructed when discharged from the hospital on February 21, 2007, Plaintiff followed up with Dr. Chen on April 17, 2007. [R. 586]. Treatment notes from this visit indicate that Plaintiff had returned to work following his hospitalization. [R. 586]. Plaintiff was complaining about the side effects associated with some of his medication. [R. 586]. Dr. Chen diagnosed Plaintiff with cariomyopathy, recent congestive heart failure, Class II New York Heart Association symptomatology[4], and normal coronaries. [R. 586].

Plaintiff next saw Dr. Chen on December 4, 2007. [R. 520]. According to Plaintiff's echocardiogram report, Dr. Chen indicated that Plaintiff had a mildly enlarged left ventricle, severe decreased left ventricle function, mild tricuspid regurgitation, and diastolic dysfunction. [R. 520]. Plaintiff returned for a follow up visit on December 11, 2007. [R. 517]. Plaintiff stated that he attended a party over the weekend and had a lot to drink. [R. 517]. Dr. Chen's notes indicate that Plaintiff still smelled of alcohol. [R. 517]. Dr. Chen diagnosed Plaintiff with cardiomyopathy and indicated it was likely alcoholic cardiomyopathy. [R. 518]. Plaintiff's ejection fraction was up from around ten (10) percent to twenty-five (25) percent; however, Plaintiff stated he was still drinking. [R. 518]. Dr. Chen also diagnosed Plaintiff with hypertension and advised him to "quit or cut down the alcohol" intake. [R. 518]. Plaintiff was instructed to return in six months. [R. 518].

---

[3]During his December 3, 2008 visit, Plaintiff filled out an identical questionnaire. [R. 232]. Plaintiff circled the number five only once indicating that his heart condition "very often" cost him money for his medical care over the previous month. [R. 232]. Plaintiff circled the number three only once suggesting his condition caused him to worry. [R. 232]. For nineteen of the remaining twenty-one questions, Plaintiff circled the number zero indiciating that his heart condition did not prevent him from living as he wanted regarding those activities. [R. 232]. Plaintiff circled the number one for two questions indicating that his condition caused minimal shortness of breath and fatigue. [R. 232].

[4]See supra footnote 2.

Plaintiff saw Dr. Chen again on at least four occasions between August 13, 2008 and March 2, 2010. [R. 494-510].  During each visit, Plaintiff's prescription medication was refilled. [R. 494-510].  Treatment notes indicate that Plaintiff continued to drink several beers per day. [R. 495, 504, 507].  During his March 2, 2010 visit, Dr. Chen "strongly encouraged [Plaintiff] to quit smoking and drinking." [R. 495].  These treatment notes also indicate that Plaintiff exercised about three times per week by walking. [R. 500, 504, 507].  Dr. Chen also noted that Plaintiff did not always take his medications as prescribed. [R. 500, 504].  The September 9, 2009 treatment notes state that Plaintiff "continue[d] to do well" and that he "maintaine[d] a good activity level." [R. 504].  During his visit on March 3, 2010, Dr. Chen noted that Plaintiff's current congestive heart failure "appear[ed] well compensated" and that there was no evidence of significant volume excess during Plaintiff's physical exam. [R. 495].  Plaintiff did state during this visit that he noticed dizziness after taking his medications. [R. 495].  Plaintiff also requested a letter "so he [could] try to get disability." [R. 495].

In a letter dated March 3, 2010, Dr. Chen stated that Plaintiff has a history of alcoholic cardiomyopathy with an ejection fraction around ten (10) percent. [R. 493].  Dr. Chen opined in this letter that Plaintiff has Class III New York Heart Association class symptomatology.[5] [R. 493].  Dr. Chen then stated that he believed Plaintiff qualified for long-term disability. [R. 493].

Plaintiff's next documented visit to Dr. Chen was on March 9, 2011. [R. 550].  Treatment notes indicate that since he had last been seen, Plaintiff "continue[d] to do well" and that he "maintain[ed] a good activity level." [R. 551].  According to Plaintiff, he was complying with his

---

[5]Class III patients have cardiac disease causing marked limitation of physical activity.  These patients are comfortable at rest; however, less than ordinary activity causes faitgue, palpitations, dyspnea, or anginal pain. *See* American Heart Association, Classes of Heart Failure, http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306 328_Article.jsp.

instructions to take his prescription medication and he had limited his consumption of alcohol. [R. 551]. Plaintiff's ejection fraction normalized to fifty (50) percent according to an echocardiogram. [R. 551]. Dr. Chen noted that he would recheck the echocardiogram and if the ejection fraction was still normal, he would recommend discontinuing Coumadin. [R. 551].

On February 26, 2010, a non-physician disability examiner, T.E. Pierce, completed a Physical RFC Assessment. [R. 83-90]. Regarding exertional limitations, Pierce concluded that Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk for a total of six (6) hours in an 8-hour work day, sit for a total of six (6) hours in an 8-hour work day, and that Plaintiff required no limitations on pushing and/or pulling. [R. 84]. Regarding postural limitations, Pierce concluded that Plaintiff could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl and that Plaintiff should never balance. [R. 85]. Pierce found that Plaintiff had no manipulative, visual, or communicative limitations. [R. 87]. And, with the exception of avoiding all exposure to hazardous machinery and heights, Pierce found Plaintiff had no environmental limitations. [R. 87].

In response to a hypothetical posed by the ALJ, a vocational expert ("VE") testified at the hearing testified that someone of Plaintiff's age, educational background, past work experience, and his RFC could perform work as an assembler or machine tender. [R. 74-75]. The VE further testified that if the individual described in the hypothetical would need occasional breaks of absences from a work station that modification would not impact her response to the hypothetical; however, prolonged absences throughout the day on a regular basis would preclude work on a sustained basis. [R. 76]. In response to a question from Plaintiff's attorney, the VE testified that she was familiar with the New York Heart Association functional classification system. [R. 76]. The VE then stated

that if the individual described in the hypothetical would need to recline for an hour a day during the normal eight hour work day that modification would preclude work on a sustained basis. [R. 76].

## II.     ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Absent such impairment, the claimant may not claim disability. *Id.* Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work,

then the claimant is deemed not disabled.  *Id.*  If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.  20 C.F.R. § 404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience.  20 C.F.R. § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that he can no longer perform former employment."  *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted).  Once a claimant shows that she can no longer perform her past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment."  *Id.*

Here, the ALJ found that Plaintiff met the insured status requirements of the Act through March 31, 2012. [R. 15].  The ALJ then concluded that Plaintiff has not engaged in substantial gainful activity since March 4, 2009, the alleged onset date. [R. 15].  The ALJ found that Plaintiff suffers from hypertension and congestive heart failure, both of which are "severe" impairments as defined by the Act. [R. 15].  Nonetheless, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 15].

After consideration of the entire record, the ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and

416.967(b) and that he has the following limitations: he can lift or carry up to twenty (20) pounds on an occasional basis and up to ten (10) pounds on a frequent basis; he can stand, walk, and sit for up to eight (8) hours during any given eight-hour work period; he has no limitations in his ability to push or pull with the lower and upper extremities; he is limited to occasional crawling, crouching, kneeling, balancing, and stooping; he can occasionally climb ramps or stairs; he can never climb ladders, ropes, or scaffolds; and he can never be exposed to occupational hazards such as unprotected heights or machinery. [R. 17]. The ALJ then concluded that Plaintiff is able to perform past relevant work as a sander because this work does not require the performance of work-related activities precluded by his RFC. [R. 22]. Alternatively, the ALJ found that even if Plaintiff could not engage in his past relevant work, his RFC permits him to engage in other jobs available in the local and national economies such as assembler and machine tender. [R. 23-24]. Thus, the ALJ ruled that Plaintiff is not disabled as that term is defined in the Act, and therefore, is not entitled to DIB or SSI. [R. 24].

### III.   Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision reversed and remanded for further consideration. [Pl.'s Mem. 11-12]. Plaintiff argues that the ALJ's decision is not supported by substantial evidence and improper legal standards were applied because: (1) the ALJ did not properly assess Plaintiff's credibility and (2) the ALJ did not give proper weight to Dr. Chen's opinion regarding Plaintiff's disability. [Pl.'s Mem. 4-11].

### IV.   Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision and whether the correct legal standards were applied. 42 U.S.C. § 405(g);

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. § 405(g) mandates that the commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1259.

## V.    Discussion

After careful review, the court concludes that the ALJ's decision is due to be affirmed for the reasons outlined below.

### A.    The ALJ Did Not Err in Weighing Plaintiff's Credibility

Plaintiff argues that the ALJ improperly rejected Plaintiff's credibility by considering evidence that Plaintiff applied for and had accepted unemployment benefits while also seeking DIB and SSI. [Pl.'s Mem. 4-7].  Plaintiff maintains that if the ALJ had given Plaintiff a proper credibility assessment on this point the ALJ would have reached a different conclusion.  As explained in detail

11

below, this court disagrees.

First, the court notes that an ALJ is not required to accept a claimant's subjective allegations of pain and may consider the claimant's credibility when making a disability determination.  *See Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  Because the ALJ rejected some of Plaintiff's subjective statements of pain on credibility grounds, he was required to "articulate explicit and adequate reasons" for doing so.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2004).  "A clearly articulated credibility finding with substantial supporting evidence in the record will not disturbed by a reviewing court."  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995).

Various circuit courts of appeals[6] have held that a claimant's application for and receipt of unemployment compensation benefits is *one* factor that the ALJ may consider in evaluating a claimant's credibility.  *See e.g.*, *Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005) ("Indeed, in applying for unemployment compensation, [claimant] represented to the relevant state authorities that he was available to work and actively seeking employment."); *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991) (finding that a claimant's application for unemployment benefits, which necessarily indicated claimant was able to work, was some evidence, although not conclusive, to negate his claim of disability); *Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 801-802 (6th Cir. 2004) (substantial evidence supported an ALJ's credibility finding when claimant admitted he applied for unemployment benefits in spite of his claim that he could not work).

Here, the ALJ found that Plaintiff's receipt of unemployment benefits while seeking Social Security disability diminished his overall credibility.  In making this finding, the ALJ stated unequivocally that Plaintiff's filing for unemployment did *not* automatically disqualify a finding of

---

[6]Neither party has cited (and this court is unaware of) any Eleventh Circuit authority directly on point.

disability. [R. 20].  The ALJ also stated that he treated Plaintiff's application for unemployment benefits as "some evidence" to negate his contention of disability but that he did not base his denial of benefits solely upon that issue. [R. 20].   Additionally, citing 20 C.F.R. 404.1512(b) and 416.912(b), the ALJ commented that he understood that receipt of unemployment benefits does not preclude receipt of Social Security benefits and that receipt of unemployment benefits was just of many factors to be considered. [R. 21].  The ALJ went on to state that he had "considered all of the underlying circumstances and not just the mere application for and receipt of unemployment benefits." [R. 21].   Against, this backdrop, the ALJ determined that Plaintiff's receipt of unemployment benefits damaged his credibility regarding his subjective complaints. [R. 20, 21].

Plaintiff has cited no authority suggesting that it was improper for the ALJ to consider Plaintiff's receipt of unemployment benefits in assessing Plaintiff's credibility.  Instead, Plaintiff cites case law and regulations indicating that receipt of unemployment benefits is not inconsistent with an application for and receipt of Social Security disability benefits. [Pl.'s Mem. 5-6].  As already noted, the ALJ acknowledged that point.  Moreover, Plaintiff maintains that Plaintiff's credibility remains intact because receipt of unemployment benefits and an application for Social Security disability benefits are not necessarily inconsistent.  First, that argument is simply off the mark.  While an application for unemployment benefits does not automatically disqualify a claimant from claiming Social Security benefits as a matter of law, it does not follow that such a benefits claim will in all cases have no effect on credibility.  Second, in the unique context of this case, Plaintiff overlooks that the ALJ based his credibility determination on a variety of other factors.  Therefore, even if Plaintiff's receipt of unemployment benefits may be consistent with a finding of disability and even if the ALJ erred in his consideration of such evidence when making his

credibility determination (which he did not), the outcome would not change.  Finally, here the ALJ correctly noted that statements made in conjunction with (as well as his testimony about) his unemployment benefits application themselves present credibility questions about Plaintiff's claim of disability before the ALJ.  At a minimum, testifying that he applied for unemployment because he "needed the money" and that he really did not seek employment while receiving unemployment benefits was fair game for the ALJ to consider.

In addition, the ALJ also found Plaintiff's credibility was damaged based upon other factors, including but not limited to, the following: (1) Plaintiff's hearing testimony regarding compliance with his medications was not supported by the objective medical evidence on record; (2) Plaintiff's hearing testimony regarding the nature and extent of his symptoms were not supported by his own admissions during various parts of his treatment or the medical evidence showing Plaintiff was proficient at social involvement and competent in activities of daily living; (3) Plaintiff's complaints about the side effects of his medications could be, and had been, corrected by adjusting the dosage and frequency of his intake; and (4) Plaintiff's complaints about fatigue and difficulty breathing were not supported by treatment notes indicating Plaintiff walked three times a week for exercise and his own hearing testimony about his ability to lift up to seventy (70) pounds on an occasional basis. [R. 18-20].

Based upon the above-mentioned factors and Plaintiff's receipt of unemployment benefits, the ALJ found Plaintiff's subjective complaints were not credible.  The ALJ articulated "explicit and adequate reasons" for doing so.  *See Dyer*, 395 F.3d at 1210.  Therefore, this court will not disturb the ALJ's findings on this issue. *See Foote*, 67 F.3d at 1562.  Accordingly, the ALJ's decision is not due to be reversed on this ground.

14

**B.      The ALJ Did Not Err in Rejecting Dr. Chen's Opinion**

Plaintiff also asserts that the ALJ's decision is due to be reversed and remanded because he did not properly apply the Eleventh Circuit's "treating physician rule." [Pl.'s Mem. 9].   When according weight to the opinion of a treating source, it is well-established that the opinion must be given substantial, considerable, or event controlling weight unless "good cause" is shown to the contrary.  *See e.g.*, *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).   "Good cause" exists when: (1) the treating physician's opinion is not bolstered by the evidence; (2) evidence supports a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis*, 125 F.3d at 1440). When the ALJ disregards the opinion of a treating physician, he must clearly articulate his reasons for doing so.  *Id.*   Failure to do so constitutes reversible error.  *Lewis*, 125 F.3d at 1440.

Here, the ALJ gave no weight to the opinion of Dr. Chen that Plaintiff has Class III New York Heart Association class symptomatology and ultimately that Plaintiff qualifies for long-term disability. [R. 21].   The ALJ stated that the letter containing these opinions is inconsistent "with the objective medical evidence all around it."[7] [R. 21].   Specifically, the ALJ noted that Dr. Chen's statement that Plaintiff ejection fraction was ten (10) percent was misleading because his own treatment notes indicated that Plaintiff's ejection fraction had improved to thirty-five (35) to thirty-nine (39) percent in 2009 and to fifty (50) percent in 2010. [R. 21].   Additionally, the ALJ

_____

[7]Notably, in March 2007 and December 2008 Plaintiff indicated on identical questionnaires that an overwhelming majority of his daily activities were not greatly affected by his heart condition. [R. 232, 249].  In fact, of the forty-six (46) combined questions, Plaintiff circled the number "zero" or "one" thirty-eight (38) times indicating Plaintiff was either not affected or that there was very little impact on these activities caused by his heart condition. [R. 232, 249].

15

commented that Dr. Chen's Class III classification was inconsistent with the "overwhelming evidence of record" including his own notes that Plaintiff showed improvement, engaged in a wide range of activities of daily living, and that Plaintiff's medically encouraged exercise program instructed him to walk for thirty (30) minutes a day, three days a week. [R. 21-22].  The ALJ further found this Class III classification inconsistent with Dr. Chen's own treatment notes that Plaintiff's heart disease was "well compensated" and the fact that Plaintiff denied chest pain and shortness of breath during his last examination at The Heart Center. [R. 22].  Moreover, the ALJ noted that Dr. Chen's assertion that Plaintiff qualifies for disability cannot be given any weight in relation to Plaintiff's application for benefits here because a finding of "disability" is an issue reserved to the Commissioner. [R. 22].  *See also* SSR 96-5p.

The ALJ's finding that Dr. Chen's opinion was inconsistent with his own medical records and that his opinion was not bolstered by other treatment notes or evidence or record constitutes "good cause" for rejecting this opinion.  *See Phillips*, 357 F.3d at 1241.  Therefore, the court finds that the ALJ clearly articulated his reasons for rejecting Dr. Chen's opinion "good cause" existed for doing so.  Thus, substantial evidence supports the ALJ's conclusions on this issue and his decision is not due to be reversed on this ground.

## VI.    Conclusion

After careful review, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination.  Thus, the Commissioner's final decision is due to be affirmed.  A separate order consistent with this memorandum of decision will be entered.

**DONE** and **ORDERED** this _____11th_____ day of April, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE